**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES KUCZMA, | ) | CASE NO. 1:16CV3072 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, James Kuczma ("Plaintiff" or "Kuczma"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

**I.    PROCEDURAL HISTORY**

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

In July 2013, Kuczma filed an application for POD and DIB, alleging a disability onset date of January 1, 2008 and claiming he was disabled due to fibromyalgia, pulmonary fibrosis, arthritis, kidney cancer, psoriasis, lung nodules, acute sinusitis, and tuberculosis.  (Transcript ("Tr.") 23, 69, 142.)  The application  was denied initially and upon reconsideration, and Kuczma requested a hearing before an administrative law judge ("ALJ").  (Tr. 23, 85-87, 89-95, 96.)

On July 31, 2015, an ALJ held a hearing, during which Kuczma, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-59.)  On September 23, 2015, the ALJ issued a written decision finding Kuczma was not disabled.  (Tr. 23-33.)  The ALJ's decision became final on October 21, 2016, when the Appeals Council declined further review.  (Tr. 1-5.)

On December 23, 2016, Kuczma filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 18, 20.)  Kuczma asserts the following assignment of error:

(1)     The Administrative Law Judge's decision that Plaintiff was not disabled prior to his date last insured is not supported by substantial evidence.

(Doc. No.  18.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Kuczma was born in February 1956 and was fifty one (51) years-old at the time of his onset date, and fifty-five (55) years old on his date last insured of March 31, 2011.[2]  (Tr. 69.)  He

---

[2] Under social security regulations, therefore, Kuczma was a "person closely approaching advanced age" on his onset date and a "person of advanced age" on his date last insured.

2

has a twelfth grade education and is able to communicate in English.  (Tr. 143.)  He has past

relevant work as a stock clerk and a highway maintenance worker.  (Tr. 50-51.)

## B.  Relevant Medical Evidence[3]

At the outset, the Court notes the parties do not direct this Court's attention to any

medical records dating between Kuczma's January 1, 2008 onset date and his March 31, 2011

DLI.  Rather, all of the records cited in the parties' briefs pre- or post-date the time period under

adjudication.

The earliest record cited by the parties is a treatment record dated August 8, 2003.  (Tr.

423-424.)  On that date, Kuczma presented to primary care physician Michael Rabovsky, M.D,

for a follow up evaluation of his fibromyalgia.  (*Id.*)  He reported feeling "achy" in his hands,

feet, calves, and inner thighs.  (*Id.*)  On examination, Dr. Rabovsky noted normal pulses, no

edema or swelling, full range of motion and "no palpable pain."  (*Id.*)  He assessed diffuse

connective tissue disorder, depressive disorder, tobacco use disorder, and "other malaise and

fatigue." (*Id.*)  Dr.  Rabovsky prescribed Flexeril and advised Kuczma to exercise and consider

physical therapy or a yoga program.  (*Id.*)

Eight months later, on April 16, 2004, Kuczma returned to Dr. Rabovsky after having

presented to the emergency room the day before for "overall body aches, upper arm pain, and

some [shortness of breath]."  (Tr. 425.)  An extensive cardiac workup was negative.  (*Id.*)  Dr.

Rabovsky noted Kuczma's symptoms were felt to be secondary to his "chronic fibromyalgia."

---

*See* 20 C.F.R. § 416.963(d) & (e).

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' briefs.

(*Id.*) Kuczma "felt better after Toradol" and was discharged from the ER with a prescription for Naprosyn. (*Id.*) On examination, Dr. Rabovsky noted Kuczma was well appearing and in no acute distress, noting his "pain now seems better." (*Id.*) Dr. Rabovsky observed no pain to palpation, good flexion and extension of Kuczma's back, normal reflexes, normal motor and sensory, negative straight leg raise, normal pulses, no edema, normal gait, full range of motion of Kuczma's shoulders, elbows, wrists, hips and knees, and "slight swelling and decreased flexion of fingers." (Tr. 426.) He assessed myalgia and myositis not otherwise specified/fibromyalgia; increased the dosage of Effexor; and advised Kuczma to exercise and continue taking Naprosyn. (*Id.*)

On June 1, 2004, Kuczma reported feeling "overall better" but complained of increased discomfort in both arms (right worse than left), accompanied by tingling in his fingers. (Tr. 426.) On examination, Dr. Rabovsky noted full range of motion in Kuczma's shoulders, elbows, and wrists; no swelling; motor examination within normal limits; intact neurovascular; no signs of muscle wasting; and positive Tinnel's on the right, negative on the left. (Tr. 427.) He assessed diffuse connective tissue disorder, myalgia and myositis not otherwise specified, and hand/wrist tenosynovitis. (*Id.*)

Kuczma next returned to Dr. Rabovsky nearly a year and a half later, on November 16, 2005. (Tr. 427-428.) He complained of "pain all over his body, in joints and muscles," as well as pain in his right lateral epicondyle (i.e., his right elbow), worse with wrist extension. (*Id.*) Examination findings were normal with the exception of tenderness over the right lateral epicondyle and pain with wrist extension. (Tr. 428.) Dr. Rabovsky assessed diffuse connective tissue disorder and lateral epicondylitis, referred Kuczma to orthopedics, and prescribed

4

Voltaren.  (*Id.*)

On January 6, 2006, Kuczma complained of diffuse body pain, indicating "everything hurts."  (Tr. 428-429.)  On examination, Dr. Rabovsky noted no motor weakness except for "slight bilateral handgrip weakness."  (Tr. 429.)  He also observed tenderness to palpation in Kuczma's lower and upper arms, pain in Kuczma's upper back and neck with rotation, full range of motion in all joints, no joint swelling, and "trigger points" over Kuczma's thumbs, elbows, and left neck.  (Tr. 429-430.)  Dr. Rabovsky assessed diffuse connective tissue disorder, myalgia and myositis, and depressive disorder.  (Tr. 430.)

On that same date, Dr. Rabovsky authored a letter as follows:

> I am the primary care physician for the above named patient.  Mr. Kuczma is being followed in my office with fibromyalgia and a mixed connective tissue disorder.  These conditions affect his ability to work.

(Tr. 548.)

On May 2, 2006, Kuczma presented to rheumatologist William Wilke, M.D.  (Tr. 180-185.)  He complained of diffuse pain, stating he first noticed the onset of generalized pain and fatigue in 1998.  (Tr. 180.)  In particular, Kuczma reported pain in his bilateral calves, thumbs, right elbow, and back.  (*Id.*)  He indicated his "energy level is not where it's supposed to be."  (*Id.*)  Kuczma stated Effexor had "helped his mood," but did not relieve his pain.  (*Id.*)  On examination, Dr. Wilke noted a dry scaly rash behind both ears.  (Tr. 181.)  He also noted bilateral tenderness at both lateral epicondyles, right greater than left.  (*Id.*)  Examination findings were otherwise normal with normal gait, good motor strength, intact sensory, normal reflexes, and normal pulses.  (*Id.*)  Dr. Wilke assessed epicondylitis and ordered an x-rays of Kuczma's hands and sacroiliac joints.  (Tr. 181, 184-185.)

5

The x-ray showed the joint spaces in Kuczma's hands were maintained but "in the radial aspects of the proximal phalanges of the long fingers there are cystlike lesions that could represent erosions in the bare areas of the PIP joints."  (Tr. 184.)  The x-ray of Kuczma's sacroiliac joints was normal.  (*Id*.)  Dr. Wilke prescribed methotrexate and administered an injection in Kuczma's right elbow, after which Kuczma reported feeling better.  (Tr. 182.)  Dr. Wilke diagnosed myalgia and myositis, as well as psoriasis.  (*Id*.)

Kuczma returned to Dr. Rabovsky on July 7, 2006.  (Tr. 430-432.)  He complained of "pain everywhere," which he described as constant since the previous January and worse with sudden drops in temperature.  (Tr. 430.)  Examination revealed tenderness to palpation of the right lateral elbow, right foot, and ankle; but was otherwise normal.  (Tr. 431.)

On August 15, 2006, Kuczma presented to the Cleveland Clinic with the following complaints:

> Symptoms began around 1995.  He first thought he was tired from working.  It got worse a few years later.  He went to a few physicians.  Pt states he has severe pain in his right arm and to a lesser extent in his left arm.  He took three Darvocet's this morning.  His feet and ankles will swell at times.  There is some pain in the right shoulder area.  Pt is not employed at the present time.  He last worked last November.  He has a psychologist's appointment related to his application for disability.  He admits to being depressed but tries to cover it up.  He also admits to being angry.  His symptoms are worse with over exertion.  He has tried multiple medications in the past but doesn't recall their names.  He has seen Dr. Richard Stein in the past who also was reluctant to prescribe narcotic containing pain medications.  He sleeps reasonably well with the trazodone. He has no history of trauma.

(Tr. 432.)  Examination findings were normal, including normal gait, reflexes, range of motion, motor and sensory examination.  (Tr. 433.)  The treatment provider[4] assessed myalgia and

---

[4] The author of this treatment note is unclear.  The beginning of the treatment note states it has been signed by Dr. Rabovsky.  (Tr. 432.)  However, the very end of the note states

myositis, and concluded as follows:

> Longstanding chronic pain.  He is obviously depressed and angry.  He has failed multiple meds on med review of epicare.  Although the diagnosis of Connective Tissue Disorder was raised in the past, I see no evidence of it.  He has clearly failed all the usual management of fibromyalgia.  I recommend avoidance of narcotic containing analgesics at this time unless recommended by a psychiatrist.  I have increased the Trazodone to try and gain some anti-depressant effect.  I strongly urged pt to consider a referral to . . . .psych pain management.  Pt asked [for] an injection today, but there was no specific area that I could identify, therefore I declined.

(Tr. 433-434.)

Kuczma returned to Dr. Rabovsky on October 19, 2006, stating "most of the pain" was in his right lateral arm.  (Tr. 434-436.)  He also reported he was moving to Florida in two weeks for a new job.  (Tr. 434.)  Examination findings were normal, with the exception that Kuczma's right elbow was tender over the lateral epicondyle.  (Tr. 435-436.)  Dr. Rabovsky assessed lateral epicondylitis, depressive disorder, diffuse connective tissue disorder, myalgia and myositis, and shortness of breath.  (*Id*.)  He continued Kuczma on his medication, and encouraged him to exercise and stop smoking.  (*Id*.)

After a nearly five year gap in treatment records, Kuczma returned to Dr. Rabovsky on August 2, 2011.  (Tr. 330-333.)  Kuczma reported he had just moved back to Ohio from Florida.  (Tr. 330.)  He indicated he had been diagnosed with psoriasis and complained of joint pains, "mostly in hands and feet."  (*Id*.)  On examination, Dr. Rabovsky noted Kuczma was well appearing, alert, and in no acute distress. (Tr. 331.)  He found (1) mild swelling of the PIP and DIP joints in Kuczma's bilateral hands, (2) decreased flexion of the fingers; and (3) "irregular

---

"pt agrees to discuss my suggestion of psyche pain management with Dr. Rabovsky, his [primary care physician]."  (Tr. 434.)

areas of erythema with variable white plaques" on Kuczma's bilateral elbows, knees, lower legs, and his right lateral thigh.  (*Id.*)  Dr. Rabovsky assessed myalgia and myositis, hand joint pain, and psoriasis.  (*Id.*)  He ordered x-rays and referred Kuczma to rheumatology.  (*Id.*)

Kuczma thereafter presented to rheumatologist Howard Epstein on August 16, 2011.  (Tr. 322-329.)  Kuczma indicated that, when he was last seen five years previously, he had been diagnosed with fibromyalgia and treated with Trazadone.  (Tr. 322.) Kuczma stated he "recently moved back to Cleveland and has been doing a lot of yard work."  (Tr. 322.)  He stated his fingers hurt at night, and complained his "joints hurt first thing in the morning, gone after finishes drinking coffee and reading paper."  (*Id.*)  After examination, Dr. Epstein found "nothing at this point to suggest psoriatic arthritis." (Tr. 324.)  He assessed primary localized hand osteoarthrosis; and joint pain, site unspecified.  (*Id.*)  Dr. Epstein ordered x-rays and recommended Kuczma take Advil 800 mg three times daily as necessary.  (*Id.*)  X-rays of Kuczma's bilateral hands and wrists taken that date revealed "tiny subcortical cysts in the head of the right long finger middle phalax and left index and long finger proximal phalanges," but were otherwise normal.  (Tr. 405-406.)

On October 3, 2011, Kuczma presented to Dr. Rabovsky, complaining of psoriasis, hand pains, and fibromyalgia pain in his upper arms and lower legs. (Tr. 319-321.)  On examination, Dr. Rabovsky noted "small patches of psoriasis" on Kuczma's back, chest, and abdomen; as well as a "more diffuse and severe area on the right elbow."  (Tr. 320.)  He also noted mild swelling of the PIP and DIP joints, but found Kuczma had full range of motion in his hands, joints, and back with normal gait, reflexes and pulses.  (Tr. 321.)  Dr. Rabovsky assessed myalgia and myositis, osteoarthritis, and psoriasis.  (*Id.*)  He discouraged Kuczma from using Advil on a

8

daily basis, and prescribed Wellbutrin.  (*Id.*)

On November 9, 2011, Kuczma presented to orthopedist Steven Maschke, M.D., after falling off a ladder and fracturing his right wrist.  (Tr. 187-188.)  He denied any elbow or shoulder pain, and reported "no other musculoskeletal complaints."  (Tr. 188.)  On examination, Dr. Maschke noted Kuczma was a "healthy-appearing male in no acute distress."  (*Id.*)  He noted swelling, mild ecchymosis, and mild tenderness at Kuczma's right wrist, but Kuczma had good digital motion, intact sensation, negative Tinel's, and normal pulses.  (*Id.*)  Dr. Maschke assessed right distal radius fracture in acceptable alignment, and ordered a short arm cast with instructions for "absolutely no lifting, pushing, pulling, or carrying."  (*Id.*)

On November 15, 2011, Kuczma presented to dermatologist David J. Hamrock, M.D., for evaluation of his psoriasis.  (Tr. 318.)  Dr. Hamrock noted "scattered, well defined psoriasiform plaques" on Kuczma's scalp, back, arms and legs.  (*Id.*)  He assessed psoriasis with arthritis and started Kuczma on Lidex cream.  (*Id.*)

Kuczma returned to Dr. Maschke on December 12, 2011, for follow-up regarding his wrist fracture.  (Tr. 316-317.)  He reported minimal pain, and stated he "painted his entire house one handed and he has done well with that."  (*Id.*)  On examination, Dr. Maschke noted "good early wrist range of motion," good digital motion, intact sensation, and "no significant discomfort."  (*Id.*)  X-rays taken that date showed maintained alignment and interval healing.  (Tr. 316-317, 225.)  Dr. Maschke recommended physical therapy, but Kuczma refused.  (Tr. 316-317.)  Dr. Maschke prescribed a wrist splint and "taught him exercises for active and gentle active-assisted range of motion."  (*Id.*)

On January 3, 2012, Kuczma presented to Dr. Rabovsky with complaints of right wrist

and lower arm pain, and "always [feeling] cold and 'freezing.'" (Tr. 310-315.)  Examination findings were normal aside from tenderness to palpation over the left first MP joint.  (Tr. 311.) Dr. Rabovsky noted "isolated histiocytosis X" of Kuczma's lung, and ordered a chest x-ray.  (Tr. 311.)  The x-ray showed chronic interstitial fibrosis.  (Tr. 407.)

Kuczma subsequently underwent a CT scan of his chest on January 9, 2012, which showed severe bilateral emphysema and lung nodules.  (Tr. 305, 408-409.)  The scan also incidentally revealed a hypodense lesion in Kuczma's right kidney.  (*Id*.)  Two days later, on January 11, 2012, Kuczma underwent an ultrasound of his kidney which showed a solid complex right renal mass, consistent with neoplasm.  (Tr. 410.)  A subsequent CT of Kuczma's abdomen revealed an "8-cm complex right renal cystic mass (Bosniak IV)" with no lymphadenopathy, venous invasion, or metastasis in the abdomen or pelvis.  (Tr. 411-412.)

On January 16, 2012, Kuczma began treatment with pulmonologist Joe Zein, M.D.  (Tr. 305-309.)  He reported a previous history of open lung biopsy that was suggestive of pulmonary histocytosis X, but stated he was never treated with steroids, continued smoking, and did not follow up with his treatment providers at the time.  (Tr. 305.)  Kuczma denied shortness of breath, cough, or chest pain.  (*Id*.)  He reported a good exercise tolerance, but complained of excessive weakness and fatigue after "long days of heavy working."  (*Id*.) On examination, Dr. Zein noted Kuczma's lungs were clear with no wheezing or rhonchi.  (Tr. 306.)  Dr. Zein diagnosed emphysema and bilateral lung nodule compatible with noncalcified granuloma.  (Tr. 308.)  After reviewing the imaging of Kuczma's kidney and abdomen, Dr. Zein determined that "the best way to approach this case is by going after the kidney" first.  (Tr. 309.)

The next day, Kuczma presented to urologist Jace Stephen Jones, M.D., for evaluation of

10

his renal mass.  (Tr. 301-304.)  Dr. Jones discussed with Kuczma the risk of malignancy, and scheduled Kuczma for a partial radical nephrectomy.  (Tr. 304.)  The record reflects Kuczma underwent the surgery on February 21, 2012, and was discharged from the hospital in stable condition on February 25, 2012.  (Tr. 214-215.)

Kuczma returned to Dr. Rabovsky for follow-up on March 20, 2012.  (Tr. 297-298.)  He reported "doing well except for surgical pain."  (*Id*.)  His energy level was improving, and he denied coughing, wheezing, or shortness of breath.  (*Id*.)  On examination, Kuczma's lungs were clear.  (Tr. 298.)  The surgical scar on his right abdomen was well healed with no signs of infection and only superficial tenderness.  (*Id*.)  Dr. Rabovsky assessed renal cell cancer, abdominal pain, neuropathic pain, and pulmonary fibrosis.  (*Id*.)  He prescribed Gabapentin, and advised Kuczma to follow up with Dr. Zein regarding his pulmonary condition.  (*Id.*)

Kuczma returned to Dr. Rabovsky on two occasions in April 2012.  (Tr. 294-296, 288-289.)  On April 4, 2012, he complained of severe pain and a rash over the surgical area.  (Tr. 294-295.)  Examination was normal aside from a fine rash over the surgical scar and "questionable mild swelling underneath this area."  (*Id*.)  Kuczma underwent an ultrasound of his abdomen that date, which was negative for underlying fluid and/or abscess.  (Tr. 295, 413.)  Dr. Rabovsky increased Kuczma's Gabapentin dosage.  (Tr. 295.)  On April 25, 2012, Kuczma complained of cold hands, as well as a rash on his feet.  (Tr. 288-289.)  Physical examination findings were normal.  (Tr. 289.)

Meanwhile, Kuczma returned to Dr. Jones on April 9, 2012, for follow up after his renal surgery.  (Tr. 290-293.)  He complained of "constant flank pain associated with burning and sharp pain." (Tr. 290.)  Dr. Jones advised him to continue using Percocet and to follow up with

11

pain management.  (Tr. 293.)

On April 25, 2012, Kuczma returned to Dr. Zein for follow up regarding his pulmonary conditions.  (Tr. 282-287.)  He reported he had stopped smoking four months previously, and denied any symptoms relating to his pulmonary system except for occasional productive cough. (Tr. 282.)  In particular, he denied shortness of breath, limitation in exercise tolerance, chest pain, and palpitation.  (*Id*.)  On examination, Kuczma was well appearing and in no acute distress.  (Tr. 283.)  His lungs were clear, and his extremities, gait, and station were all normal. (*Id*.)  A CT scan of his lungs showed multiple lung nodules unchanged from previous exam.  (Tr. 286.)  Dr. Zein assessed langerhans cell histocytosis, emphysema, multiple lung nodules, and renal cell carcinoma.  (Tr. 286-287.)  He advised Kuczma to return for a repeat CT scan of his chest in four months.  (Tr. 287.)

On August 21, 2012, Kuczma returned to Dr. Rabovsky with complaints of pain over his left wrist, and tenderness over his surgical scar.  (Tr. 277-281.)  On examination, Kuczma's lungs were clear and his surgical scar was well healed with no signs of inflammation.  (Tr. 278.) Dr. Rabovsky did note tenderness to palpation and mild swelling in Kuczma's left thumb, and ordered an x-ray.  (*Id*.)  The x-ray revealed mild to moderate degenerative changes.  (Tr. 416.)

On September 11, 2012, Kuczma presented to Dr. Hamrock for follow-up regarding his psoriasis.  (Tr. 276.)  He reported no excessive fatigue or weight loss, and stated his "joints feel OK."  (*Id*.)  Dr.  Hamrock found Kuczma's psoriasis was under good control and decreased his methotextrate dosage.  (*Id*.)

The following month, Kuczma presented to certified nurse practitioner Michell Angie, C.N.P., for follow up regarding his renal surgery.  (Tr. 269-275.)  He denied flank pain and

stated he was generally doing well, although he did report intermittent right upper quadrant pain. (Tr. 269.)  Examination was normal, including normal respiratory and cardiovascular findings. (Tr. 270.)  Scans of Kuczma's chest, abdomen and pelvis showed (1) evidence of chronic lung disease, but no developing mass or adenopathy; and (2) no developing mass in his right or left kidneys.  (Tr. 417-418.)

In April 2013, Kuczma presented to Kalman Bencsath, M.D., for evaluation of a right inguinal hernia.  (Tr. 266-268.)  He reported the hernia had been "present for years but over the past week it has become painful."  (Tr. 266.)  Physical examination findings were normal.  (Tr. 267.)  Dr. Bencsath assessed reducible right inguinal hernia.  (*Id*.)  Kuczma underwent a laparoscopic right inguinal hernia repair with mesh later that month.  (Tr. 363-368.)   The following month, he was treated for pneumonia.  (Tr. 207.)

On July 19, 2013, Kuczma presented to Eric Cober, M.D., for an opinion regarding tuberculosis.  (Tr. 207-213.)  Dr. Cober determined "at the least, [Kuczma] has latent TB," and noted this would need to be addressed prior to any biologic therapy for his psoriasis.  (Tr. 209.) Dr. Cober also noted Kuczma had no clinical signs or symptoms of active tuberculosis, but indicated this would need to be ruled out before administering any treatment for latent TB.  (*Id*.)

In March 2014, Kuczma returned to Dr. Maschke with complaints of left thumb pain and weakness for the past several months.  (Tr. 262-265.)  He reported increased pain with activities involving pinch and grip, e.g., opening jars, turning car keys, buttoning.  (Tr. 262.)  On examination, Kuczma had painless range of motion in his shoulders and elbow, negative carpal tunnel compression testing and Phalen's on the left, no thenar atrophy, and intact sensation and pulses.  (Tr. 263.)  Dr. Maschke did note instability of the base of the left first metacarpal.  (*Id*.)

13

An x-ray of Kuczma's left thumb showed left thumb CMC osteoarthritis.  (*Id.*)  Dr. Maschke

prescribed a splint and administered a cortisone injection.  (*Id.*)

Kuczma followed up with Dr. Zein on April 28, 2014.  (Tr. 255-261.)  He continued to

deny any pulmonary symptoms, aside from occasional productive cough.  (Tr. 255.)  A CT of

Kuczma's chest (performed February 2014) remained unchanged, and Kuczma's lungs were

clear on examination.  (Tr. 255-256.)

Kuczma returned to Dr. Maschke in August 2014, complaining of severe left thumb pain

(Tr. 251.)  He reported no relief with his previous treatment, and elected for surgery.  (*Id.*)  The

following month, Kuczma underwent a left thumb CMC arthroplasty.  (Tr. 354.)  He

subsequently underwent occupational therapy and, by November 2014, reported he was "very

pleased with the current progress" and experiencing "minimal pain" in his thumb.  (Tr. 337.)

## C.  State Agency Reports

On August 26, 2013, state agency physician Eli Perencevich, D.O., reviewed Kuczma's

medical records and completed a Case Analysis for the period between the January 1, 2008 onset

date and the March 31, 2011 DLI.  (Tr. 71-72.)  Dr. Perencevich concluded as follows:

> Alleges pulmonary fibrosis, fibromyalgia, kidney cancer, arthritis, psoriatic
> arthritis, lung nodules, acute sinusitis.
>
> There is no medical evidence available for the relevant time period.  Therefore,
> the evidence is insufficient to establish a severe [medically determinable
> impairment] prior to the DLI.

(*Id.*)

On December 20, 2013, state agency physician Gary Hinzman, M.D., reviewed

Kuczma's medical records and completed a Case Analysis for the same time period.  (Tr. 79.)

Dr. Hinzman also reached the conclusion the evidence was insufficient to establish a severe

14

medically determinable impairment prior to Kuczma's DLI.  (*Id.*)

**D.     Hearing Testimony**

During the July 31, 2015 hearing, Kuczma testified to the following:

- He started the twelfth grade, but did not complete it.  (Tr. 38.)  He has worked in various jobs over the years, including loading/unloading trucks for a toy store and "working in asphalt."  (Tr. 37-38.)

- He chose an onset date of January 1, 2008 because that is when he "just started basically falling apart."  (Tr. 37.)  He suffers from numerous physical health problems, including fibromyalgia and psoriasis.  (Tr. 38-39.)  His lung collapsed twice, he broke his hand, and he has had pneumonia twice.  (Tr. 40-41.)  He has also had a hernia repair and has been diagnosed with tuberculosis.  (Tr. 40, 42.)

- He suffers from fatigue and shortness of breath. (Tr. 37, 44-45.)  He quit smoking in 2011 and uses an inhaler.  (Tr. 41, 45.)  He is sensitive to weather changes, and has a particularly difficult time with cold weather.  (Tr. 47-48.)  He moved to Florida because his doctor thought the climate would be better for his health; however, "the pain still went with [him]."  (Tr. 47.)

- His psoriasis affects his hands.  (Tr.  46.)  He lost strength in his left hand.  (*Id.*)  His hands get very cold and he needs to wear mittens to warm them.  (*Id.*)
-
- He can feel the fibromyalgia pain "continuously through his muscles." (Tr. 39.)  "Every single day it just kept getting worse for [him.]"  (Tr. 38.)

- His health problems have become very depressing for him.  (Tr. 41.)  He misses "doing a lot of things that [he] can't do anymore," such as helping his wife with chores.  (Tr. 48-49.)

The VE testified Kuczma had past work as a stock clerk (heavy, semiskilled, SVP 4) and

highway maintenance worker (medium, semiskilled, SVP 3).  (Tr. 50-51.)  The ALJ then posed

the following hypothetical question:

This first person is male, currently 59 years of age, less than a high school education, same work background as the claimant.  This first person can lift and carry 50 pounds occasionally, 25 pounds frequently.  Can stand/walk six out of eight.  Can sit six out of eight.  Frequently push, pull and foot pedal.  Can frequently use a ramp or stairs.  Only occasionally use a ladder, rope or a scaffold.  Can constantly balance.  Frequently stoop, occasionally kneel,

15

frequent crouch, occasionally crawl.  Manipulative capabilities are all frequent;
reaching, handling, fingering and feeling, including overhead.  This person has
no visual limits, no communication deficits.  This person should avoid high
concentrations of cold, wetness, humidity, smoke, fumes, dust and pollutants,
and that's it.

(Tr. 53.)

The VE testified the hypothetical individual would not be able to perform Kuczma's past

work as stock clerk and highway maintenance worker but would be able to perform other

representative jobs in the economy, such as store laborer (medium, unskilled, SVP 2); hand

packager (medium, unskilled, SVP 2); and counter supply worker (medium, unskilled, SVP 2).

(Tr. 53.)

The ALJ then asked a second hypothetical as follows:

I'm going to change the lift/carry to 20 pounds occasionally, 10 pounds
frequently, and eliminate entirely being around smoke, fumes, dust and pollutants.
* * * All the rest is exactly the same as the first hypothetical.

(Tr. 54.)  The VE testified the hypothetical individual would not be able to perform Kuczma's

past work but would be able to perform other representative jobs in the economy such as

cafeteria attendant (light, unskilled, SVP 2); counter attendant (light, unskilled, SVP 2); and

hand packager (light, unskilled, SVP 2).  (Tr. 54-55.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Kuczma was insured on his alleged disability onset date, January 1, 2008, and

17

remained insured through March 31, 2011, his date last insured ("DLI.")  (Tr. 23.)  Therefore, in

order to be entitled to POD and DIB, Kuczma must establish a continuous twelve month period

of disability commencing between these dates.  Any discontinuity in the twelve month period

precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2011.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2008 through his date last insured of March 31, 2011 (20 CFR 404.1571 *et seq.*)

3.  Through the date last insured, the claimant had the following medically determinable impairments: epicondylitis and psoriasis (20 CFR 404.1521 *et seq.*)

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*)

5.  The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2008, the alleged onset date, through March 31, 2011, the date last insured (20 CFR 404.1520(c)).

(Tr. 23-30.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

18

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

19

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Step Two

Kuczma asserts several errors relating to the ALJ's step two analysis.  First, he maintains the ALJ erred in finding his fibromyalgia, pulmonary fibrosis/emphysema, kidney cancer, hand arthritis, and lung nodules did not constitute "medically determinable impairments."  (Doc. No. 18 at 8-11.)  Kuczma further asserts substantial evidence does not support the ALJ's conclusion that his epicondylitis and psoriasis were not "severe" impairments

20

during the relevant period.  (*Id*.)  He argues the ALJ failed to consider all of the relevant medical records, most notably Dr. Rabovsky's treatment notes pre-dating the January 2008 onset date. Moreover, Kuczma asserts "the ALJ's failure to consider symptoms and conditions diagnosed and discussed not long after Plaintiff's date last insured should be construed as a lack of substantial evidence as it relates to his conclusions regarding Plaintiff's severe impairments." (*Id*. at 11.)  Finally, Kuczma maintains the ALJ should have consulted a medical expert to review his medical records to assist in establishing a proper onset date, particularly since "complex issues were involved."  (*Id.* at 8.)

The Commissioner argues substantial evidence supports the ALJ's determination that Kuczma did not have a severe impairment.  (Doc. No. 20 at 9.)  She maintains the ALJ considered evidence of Kuczma's treatment for diffuse pain and psoriasis in 2006, but noted examination findings at the time were largely normal and did not satisfy regulatory requirements for establishing fibromyalgia.  (*Id*. at 9-10.)  The Commissioner further asserts "the ALJ reasonably concluded that the normal physical examination findings immediately prior to and following the relevant period did not reflect that Plaintiff's epicondylitis or psoriasis were severe impairments."  (*Id.* at 10.)  She emphasizes the ALJ reasonably relied on the fact that Kuczma did not receive any documented treatment between his onset date and DLI, "suggesting that his impairments did not significantly limit his ability to perform basic work activities during this period."  (*Id.*)  The Commissioner also asserts substantial evidence supports the ALJ's findings that Kuczma's pulmonary conditions, kidney cancer, and hand osteoarthritis did not arise prior to his DLI.  (*Id*. at 13.)  Finally, the Commissioner argues the ALJ did not err in failing to consult a medical expert regarding Kuczma's onset date because SSR 83-20 applies only when an ALJ

determines a claimant is disabled, a finding the ALJ did not make in this case.  (*Id*. at 14.)

The Court will address each of Kuczma's arguments, in turn.

### *Medically Determinable Impairments*

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques. *See* 20 CFR § 404.1521; Social Security Ruling ("S.S.R.") 96–4P, 1996 WL 374187, at *1 (S.S.A. July 2, 199).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings.  *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment."  S.S.R. 06–03P, 2006 WL 2329939, at *2; 20 CFR 404.1513(a) and 416.913(a).  "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4P, 1996 WL 374187, at *1 (S.S.A. July 2, 1996).  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. §§ 404.1529(b) and 416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory

22

findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, 2017 WL 749185 at * 6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2017 WL 655402 at * 8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.")  *See also Kavalousky v. Colvin*, 2013 WL 1910433 at * 7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Here, the ALJ determined, at step two, that the only "medically determinable impairments" suffered by Kuczma prior to his DLI were epicondylitis (elbow tendon inflammation) and psoriasis.  (Tr. 25.)  The ALJ acknowledged Kuczma's complaints of diffuse pain and fatigue, but determined his fibromyalgia did not constitute a "medically determinable impairment" for the following reasons:

> The claimant alleged fibromyalgia as an impairment during the relevant adjudicative period.  There is no established listing regarding fibromyalgia; however, Social Security Ruling 12-2p provides guidance in evaluating disability claims of individuals with fibromyalgia.  SSR 12-2p notes when a claimant seeks disability due to fibromyalgia, I must properly consider the claimant's symptoms when deciding the claimant has a medically determinable impairment of fibromyalgia.  In order to establish a finding of fibromyalgia, the claimant must have a positive diagnosis from a medically acceptable source with documented evidence consistent with a diagnosis of fibromyalgia.  Generally, the claimant must meet the 1990 American College of Rheumatology criteria of widespread pain in all quadrants of the body and axial skeletal pain that persisted for at least three months and at least 11 out of 18 positive tender points on a physical examination.  Additionally, the administration may use the 2010 American College of Rheumatology Criteria, which requires only a history of widespread

23

pain and repeated manifestations of six or more fibromyalgia symptoms including: fatigue, cognitive or memory problems (aka fibromyalgia fog), waking un-refreshed, depression, anxiety disorder, or irritable bowel syndrome.  If using the 2010 American College of Rheumatology Criteria, there must be evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

In this case, the record reveals no treatment appointments for fibromyalgia from January 2008 through March 2011.  A treatment appointment in August 2011, after the expiration of his date last insured, reveals that he was diagnosed with fibromyalgia five years prior and was treated with Trazadone, which he reported helped with his sleep. (Exhibit 2F:73). The record reveals that the claimant underwent a physical examination with William Wilke, M.D. in May 2006; however, this examination does not mention any positive tender points. (Exhibit 1F:7). While Dr. Wilke diagnosed the claimant with myalgia and myositis not otherwise specified, the claimant's physical examination only revealed bilateral tenderness at both of his elbows and a rash behind his ears, which is not sufficient to establish a diagnosis of fibromyalgia.  (*Id*.)  Upon review of the claimant's treatment history, I find that the claimant's alleged fibromyalgia is not established as a medically determinable impairment during the relevant adjudicative period. Even if it were a medically determinable impairment, there is no treatment history during the relevant adjudicative period establishing that his alleged fibromyalgia more than minimally limited his ability to perform basic work activities. Therefore, the claimant's alleged fibromyalgia is not a medically determinable impairment or is otherwise not a severe impairment during the relevant adjudicative period.

(Tr. 26.)

The Court finds Kuczma has not carried his burden of establishing fibromyalgia[5] as a medically determinable impairment.  First and foremost, the ALJ correctly noted Kuczma failed to produce any medical evidence that he received treatment for fibromyalgia between his onset date of January 1, 2008 and his date last insured of March 31, 2011.  (Tr. 26.)  Kuczma does not challenge this assertion, or otherwise direct this Court's attention to any treatment records or other medical evidence suggesting he was diagnosed with or received treatment for fibromyalgia

---

[5] The Court interprets the ALJ's analysis of Kuczma's fibromyalgia as including and also addressing the related conditions of myalgia, myositis, and connective tissue disorder.

24

during the time period under adjudication.  This fact alone provides strong support for the ALJ's

conclusion Kuczma's fibromyalgia did constitute a "medically determinable impairment" during

the relevant period.

      Kuczma, however, attempts to "connect the dots," arguing the ALJ's determination is

not supported by substantial evidence because treatment records before his onset date and after

his DLI demonstrate he suffered from fibromyalgia.  This argument is without merit.  The ALJ

acknowledged Dr. Epstein's August 2011 treatment note, in which Kuczma stated he had been

diagnosed with fibromyalgia five years previously (i.e., in 2006) and treated with Trazodone.

(Tr. 26.)  The ALJ noted, however, that Kuczma's rheumatologist, Dr. Wilke, examined him in

May 2006 and failed to indicate examination findings sufficient to establish a diagnosis of

fibromyalgia, specifically noting Dr. Wilke did not mention any positive tender points and his

examination revealed bilateral elbow tenderness and a rash but was otherwise normal. (*Id*.)

      The ALJ's finding is supported by substantial evidence.  The ALJ appropriately

acknowledged and relied on S.S.R. 12-2p, 2012 WL 3104869 in evaluating Kuczma's claim of

fibromyalgia.  (Tr. 26.)  That Ruling describes fibromyalgia as "a complex medical condition

characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues

that has persisted for at least 3 months."  SSR 12–2p, 2012 WL 3104869, at *2.  SSR 12–2p

explains fibromyalgia is a "common syndrome" and that a person's symptoms must be

considered when the agency decides if the individual has a medically determinable impairment

("MDI") of fibromyalgia ("FM").  *Id*.  Pursuant to the Ruling, "FM is an MDI when it is

established by appropriate medical evidence," and the disease "can be the basis for a finding of

disability."  *Id*.  Only a licensed physician can provide evidence of an MDI of FM, but the

physician's diagnosis alone is insufficient.  *Id*.  Rather, the evidence must "document that the physician reviewed the person's medical history and conducted a physical exam."  *Id*.  The agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities."  *Id.*

The Agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record.  *Id.*  Under § II. A., the agency "may find that a person has an MDI of FM if he or she has all three of the following":

> 1.  A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which "may fluctuate in intensity and may not always be present;"
>
> 2.  "At least 11 positive tender points on physical examination" which must be found in specified locations;[6] and

---

[6]  SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body.  SSR 12–2p, 2012 WL 3104869 at *3.  The tender points are located at the following 18 sites: Occiput (base of the skull); Low cervical spine (back and side of the neck);  Trapezius muscle (shoulder); Supraspinatus muscle (near the shoulder blade);  Second rib (top of the rib cage near the sternum or breast bone); Lateral epicondyle (outer aspect of the elbow); Gluteal (top of the buttock); Greater trochanter (below the hip); and Inner aspect of the knee.  *Id*.  The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure

3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclea antibody, thyroid function, and rheumatoid factor)."

*Id.* at *2–3.  Alternatively, a person may be found to have a medically determinable impairment of fibromyalgia under § II.B of SSR 12-2p if he has all three of the following criteria:

1. A history of widespread pain as described under § II. A.;

2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and

3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id*. at 3.  Co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome."  *Id*. at fn. 10.

Here, Dr. Wilke reported in May 2006 that Kuczma's physical examination was largely normal, finding only bilateral tenderness at the elbows and a rash behind Kuczma's ears.  (Tr. 180-185.)  Dr. Wilke did not document any tender points during this examination nor is there any evidence from his treatment record that each of the other disorders that could have caused Kuczma's complaints of qdiffuse pain (as set forth in SSR 12-2p) were excluded.  (*Id*.)  While Dr. Rabovsky did diagnosis fibromyalgia as early as April 2004 (Tr. 425-426), "a diagnosis of [fibromyalgia] is not sufficient to establish a [medically determinable impairment] pursuant to SSR 12-2p."  *Walters v. Comm'r of Soc. Sec*., 2015 WL 1851451 at * 7 (S.D. Ohio April 22,

to the site."  *Id*. at § II.A.2.b.

27

2015), *report and recommendation adopted* by 2015 WL 5693640 (S.D. Ohio Sept. 29, 2015).

Rather, a fibromyalgia diagnosis must be supported by the criteria set forth in § II.A. or § II.B. of

SSR 12-2p to satisfy the requirements of that Ruling.  Here, Kuczma has not demonstrated the

Ruling's requirements were satisfied by the treatment records of any of his physicians, including

Dr. Rabovsky[7] or Dr. Epstein.  Accordingly, and for all the reasons set forth above, the Court

finds substantial evidence supports the ALJ's determination that Kuczma's fibromyalgia did not

constitute a "medically determinable impairment" during the relevant period.[8]

      Moreover, the Court notes the ALJ went on to find that "[e]ven if it were a medically

determinable impairment, there is no treatment history during the relevant adjudicative period

---

[7] The Court notes that, in January 2006 (two years prior to Kuczma's onset date), Dr.
Rabovsky noted an unspecified number of "trigger points" over Kuczma's thumbs,
elbows, and left neck.  (Tr. 429-430.)  This treatment record, however, fails to satisfy
SSR 12-2p's requirements of "at least 11 positive tender points on physical examination"
at the specific locations set forth in that Ruling.  *See, e.g., Walters*, 2015 WL at 1851451
at * 8 ("Neither Dr. Stevens' finding of an inexact number and location of 'multiple
trigger points' nor Dr. Vitols' report of pain to palpation at an unspecified number of sites
satisfies the requirements of SSR 12–2p § II.A.2.").

[8] Kuczma complains the ALJ failed to explicitly acknowledge and discuss Dr.
Rabovsky's treatment notes pre-dating his onset date.  (Doc. No. 18 at 9.)  It is well
settled, however, that an ALJ is not required to discuss each and every piece of evidence
in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 Fed.
App'x 661, 665 (6th Cir. 2004); *Moscorelli v. Colvin*, 2016 WL 4486851 at * 3 (N.D.
Ohio Aug. 26, 2016).  Here, the ALJ discussed treatment records pre-dating Kuczma's
onset date relating to his fibromyalgia complaints (Tr. 26) and properly found those
records did not demonstrate Kuczma's fibromyalgia constituted a medically determinable
impairment.  Kuczma has not shown other pre-onset treatment notes in the record would
warrant a different conclusion.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x. 171,
173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are
not required to "convert judicial review of agency action into a ping-pong game.")
(quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22
L.Ed.2d 709 (1969)); *Jefferson v. Colvin*, 2015 WL 4459928 at * 8 (N.D. Ohio July 21,
2015) (same).

establishing that [Kuczma's] alleged fibromyalgia more than minimally limited his ability to

perform basic work activities" and, "[t]herefore, the claimant's alleged fibromyalgia is . . .

otherwise not a severe impairment during the relevant adjudicative period." (Tr. 26.)  The

regulations define a "severe" impairment as an "impairment or combination of impairments

which significantly limits [the claimant's] physical or mental ability to do basic work activities

..." 20 CFR § 404.1520(c).[9]  Here, Kuczma has not introduced any evidence that his

fibromyalgia significantly limited his ability to basic work activities during the relevant time

period.  Indeed, Kuczma has not directed this Court's attention to any medical evidence dating

between his January 2008 onset date and March 2011 DLI, much less evidence documenting

significant limitations resulting from his fibromyalgia.  Moreover, while Dr. Rabovsky opined

generally in January 2006 that Kuczma's fibromyalgia "affect[ed] his ability to work," the record

reflects Kuczma left Ohio several months later to take a new job in Florida.  (Tr. 548, 434.)

When Kuczma returned to Cleveland five years later, he reported "doing a lot of yard work" and

"paint[ing] his entire house."  (Tr. 322, 316-317.)  Indeed, physical examination findings in

August and October 2011 were generally normal, aside from mild swelling and tenderness in

Kuczma's hands and fingers.  (Tr. 322-329, 319-321, 330-333.)  Thus, the Court finds the ALJ

did not err in his step two evaluation of Kuczma's fibromyalgia.

      The ALJ also determined Kuczma's pulmonary fibrosis, kidney cancer, renal mass,

---

[9] "Basic work activities" are defined in the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id.*

29

arthritis, lung nodules, tuberculosis and acute sinusitis did not constitute medically determinable

impairments, reasoning as follows:

> [T]here is no objective evidence establishing them as medically determinable
> impairments prior to the expiration of the claimant's date last insured.
> Specifically, it was not until August 2011 that the claimant was diagnosed with
> osteoarthritis of the hand, which is outside the relevant adjudicative period.
> (Exhibit 2F:75).  Moreover, the claimant was diagnosed with pulmonary fibrosis
> and underwent a partial right nephrectomy due to a right renal mass and renal cell
> carcinoma in February 2012, approximately eleven months after the expiration of
> his date last insured. In addition, a computerized tomography (CT) scan of his
> chest revealed lung nodules in April 2012, thirteen months after the expiration of
> his date last insured. (Exhibit IF: 17-18, 25; Exhibit 2F: 10, 20). Similarly, the
> claimant tested positive for tuberculosis in July 2013, over two years after the
> expiration of his date last insured. (Exhibit 1F:33-35).  Further, there is a mention
> of acute sinusitis in the claimant's past medical history; however, there is no
> treatment history or diagnosis by acceptable medical source with supporting
> objective evidence to substantiate acute sinusitis as a medically determinable
> impairment. Therefore, in reviewing the record as a whole, I conclude that the
> claimant's alleged pulmonary fibrosis, kidney cancer, renal mass, arthritis, lung
> nodules, tuberculosis, and acute sinusitis are not established as medically
> determinable impairments during the relevant adjudicative period.

(Tr. 26-27.)

Substantial evidence supports the ALJ's determination.  While Kuczma intermittently

complained of achiness, tingling and pain in his fingers between 2004 and 2006, treatment

records do not reflect a diagnosis of hand osteoarthritis until August 2011, eight months after

Kuczma's DLI.  Additionally, the ALJ correctly notes Kuczma was not diagnosed with

pulmonary fibrosis, emphysema, or lung nodules until January 2012, nearly ten months after his

DLI.  Physical examinations prior to that time consistently showed Kuczma's lungs were clear.

(Tr. 424, 181, 426, 427, 429, 431, 433, 435.)  Lastly, the ALJ correctly notes Kuczma was not

diagnosed with kidney cancer, renal mass, and/or tuberculosis until well after his DLI.  (Tr. 209,

301-309, 408-412.)  Accordingly, the Court finds the ALJ did not err in determining these

conditions were not medically determinable impairments during the relevant time period.

### Non-Severe Impairments

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities ..." 20 CFR § 404.1520(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*.

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).

Here, the ALJ determined Kuczma suffered from the medically determinable impairments of epicondylitis and psoriasis, but determined those impairments were not "severe."

31

(Tr. 25, 28-29.)  The ALJ first acknowledged Kuczma's complaints of fatigue, shortness of

breath, swelling and loss of strength in his hands, and pain.  (Tr. 28.)  The ALJ concluded

Kuczma's medically determinable impairments could have been reasonably expected to produce

his alleged symptoms; however, he found Kuczma's statements concerning the intensity,

persistence and limiting effects of these symptoms were "not entirely credible."  (*Id.*)  The ALJ

then discussed medical evidence from both prior to Kuczma's onset date and after his DLI, and

determined it did not substantiate the severity of his alleged medical conditions during the

relevant time period.  (Tr. 28-29.)  The ALJ explained as follows:

> Based on a review of the evidence, I conclude that the claimant has proffered
> sufficient evidence to establish epicondylitis and psoriasis as medically
> determinable impairments during the relevant adjudicative period; however, these
> conditions considered singly or in combination [do not] cause more than minimal
> limitation in his ability to complete basic work activities.  The only objective
> evidence prior to the expiration is a physical examination and x-ray imaging in
> May 2006, which is over eighteen months before his alleged onset date of
> disability and not convincing of more than minimal limitations. (Exhibit 1F:7).
> Notably, the claimant reported diffuse pain, but presented in no acute distress, and
> his physical examination was generally normal with the exception of bilateral
> tenderness on his elbows and a rash behind his ears, none of which suggests more
> than minimal functional limitations.  Moreover, the treatment for his epicondylitis
> was only an injection, a conservative measure, and he received good result
> afterward.  Additionally, the claimant continued to work with these conditions
> until January 2008, which suggests that his conditions did not cause more than
> minimal limitations.  While x- ray imaging of his hand was positive for cystic
> changes, there is no treatment history in the record from January 2008 through
> March 2011.  This lack of treatment implies that his conditions are not as severe
> as alleged during the relevant adjudicative period, and casts doubt on his claim for
> disability.
>
> Moreover, he was not diagnosed with osteoarthritis of the hand until three months
> after the expiration of his date last insured and over three years after he stopped
> working, implying that his alleged arthritis and hand problems were not as severe
> as alleged during the relevant adjudicative period and were not the true reason
> behind his application for disability.  Even if his hand problems were as severe as
> alleged, there is no objective evidence of treatment during the relevant
> adjudicative period that would substantiate a finding of a severe impairment

32

causing disabling symptoms.  Furthermore, there is no objective evidence of pulmonary problems during the relevant adjudicative period, and while the claimant testified that he has been taking daytime naps since 2006, he also alleged that he did not stop working until January 2008, which  casts doubt on his implication of severe fatigue since 2006.  (Hearing Testimony).  Therefore, in reviewing the record as a whole, I conclude that the claimant's impairments are not severe during the relevant adjudicative period.

(Tr. 29.)

Substantial evidence supports the ALJ's determination that Kuczma's epicondylitis and psoriasis were not "severe" during the relevant time period.  The ALJ considered the medical evidence both before Kuczma's January 2008 onset date and after his March 2011 DLI.  In so doing, the ALJ correctly noted Kuczma's pre-onset treatment records consistently showed largely normal physical examination findings with the exception of mild swelling and tenderness in his elbows and fingers and a dry scaly rash.  These pre-onset date records also reflect conservative treatment, limited to medication, exercise, and (on one occasion) an injection in Kuczma's right elbow.  (Tr. 182.)  Moreover, while treatment records post-dating Kuczma's DLI show continued treatment for these conditions, Kuczma has not shown these records demonstrate any of his physical impairments were "severe" during the relevant time period.[10]

_____

[10] In order to qualify for DIB, a claimant must "establish the onset of disability prior to the expiration or his [or her] insured status."  *Garner*, 745 F.2d at 390.  The Sixth Circuit has explained that "evidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir.2004) (citation omitted).  To be relevant to the disability decision, "[p]ost-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured."  *Wirth v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 478, 480 (6th Cir.2003).  *See also Jones v. Comm'r of Soc. Sec.*, 2015 WL 1004681, at *8 (E.D. Mich. Mar. 6, 2015) ("evidence issued after a date last insured generally lacks probative value."); *King v. Berryhill*, 2017 WL 1907265 at * 15 (N.D. Ohio March 23, 2017); *Kingery v. Comm'r of Soc. Sec.*, 142 F.Supp.3d 598, 602 (S.D. Ohio 2015); *Hibbard v. Astrue*, 537 F. Supp.2d 867, 873 (E.D. Ky. 2008).  Here, Kuczma has not satisfied his burden of demonstrating the post-DLI medical evidence relates back to his

33

Significantly, Kuczma does not challenge the fact that there is no medical evidence in the record indicating he received any treatment for any of his alleged impairments during the relevant time period.  From this absence of evidence, the ALJ reasonably concluded Kuczma's impairments did not significantly limit his ability to perform basic work activities during this period.  *See e.g.*, *Strong*, 88 Fed. Appx. at 845 ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment.  A failure to do so may cast doubt on a claimant's assertions of disabling pain.") *citing Williams v. Bowen*, 790 F.2d 713, 715 (8th Cir.1986) and *Kimbrough v. Sec'y of Health & Human Servs*., 801 F.2d 794, 797 (6th Cir.1986).  Moreover, Kuczma has not directed this Court's attention to any treating physician opinion (from either before, during, or after the relevant time period) indicating any specific restrictions or functional limitations relating to any of his various physical impairments, or otherwise indicating his impairments significantly limited his ability to engage in basic work activities.[11]

Lastly, the Court rejects Kuczma's argument the ALJ was required pursuant to SSR 83-20 to consult a medical expert regarding the alleged onset date of his allegedly progressively worsening conditions.  Social Security Ruling 83-20 governs the determination of disability onset date.  *See* SSR 83-20, 1983 WL 31249 (1983).  However, as the Commissioner correctly

---

condition during the relevant time period sufficient to demonstrate that his impairments were "severe" for purposes of social security regulations.

[11] The Court recognizes Dr. Rabovsky indicated in January 2006 that Kuczma's fibromyalgia "affect[ed] his ability to work."  (Tr. 548.)  Not only does this opinion pre-ate Kuczma's onset date by two years, it is entirely vague and offers no specific opinion regarding the extent to which Kuczma's ability to perform basic work activities is affected.

notes, this Ruling applies only when an ALJ determines a claimant is disabled but cannot reasonably infer the date of onset.  Because Kuczma was found not to be disabled prior to his DLI, there was no need to determine an onset date of any disability.  Thus, there was no error by the ALJ related to any failure to apply SSR 83-20 in this matter.[12]  *See Clendening v. Comm'r of Soc. Sec.*, 482 Fed. Appx. 93, 95 (6th Cir. 2012) (citing *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997)); *Velez v. Comm'r of Soc. Sec.*, 2017 WL 661651 at * 6 (N.D. Ohio Feb. 17, 2017); *Monville v. Comm'r of Soc. Sec.*, 2017 WL 4081854 at * 3 (E. D. Mich. Sept. 15, 2017).

Accordingly, and for all the reasons set forth above, the Court finds substantial evidence supports the ALJ's step two determination.  Kuczma's arguments to the contrary are without merit.

---

[12] The Court also notes that an AL's "determination of whether a medical expert is necessary is inherently a discretionary decision."  *Ruby v. Colvin*, 2014 WL 5782930 at *13 (S.D. Ohio Nov. 6, 2014).  *See also Nebra A. Simpson v. Comm'r of Social Security*, 2009 WL 2628355 (6th Cir. Aug. 27, 2009) (unreported) at *8; *Foster v. H alter,* 279 F.3d 348, 355 (6th Cir. 2001) (finding an ALJ has the "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."); *O'Neill v. Colvin*, 2014 WL 3510982 at * 18 (N.D. Ohio July 9, 2014) ("ALJs retain discretion as to whether to call a medical expert").  An ALJ abuses his discretion only when the testimony of a medical expert is "'required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  *See* 20 C.F.R. § 416.1444.'"  *Ruby,* 2014 WL 5782930 at *13 (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1467–68 (5th Cir. 1989)).  Kuczma has entirely failed to demonstrate the ALJ abused his discretion in failing to consult an ME in the instant case.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 19, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**